SCOTT N. SCHOOLS (SCBN 9990)
United States Attorney

MARK L. KROTOSKI (CSBN 138549)
Chief, Criminal Division

**ORIGINAL
FILED**

STEPHANIE M. HINDS (CSBN 154284)
Assistant United States Attorney

JUN 1 3 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

450 Golden Gate Avenue, Box 36055
San Francisco, CA 94102
Telephone: (415) 436-6816
Facsimile: (415) 436-6748
email: stephanie.hinds@usdoj.gov   E-filing

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MMC

UNITED STATES OF AMERICA,

              Plaintiff,

    v.

No.

C 07

**COMPLAINT FOR FORFEITURE**

1.  1997 LAMBORGHINI DIABLO, VIN
    ZA9RU37P6VLA12636,

2.  2006 PORSCHE CAYENNE TURBO,
    VIN WP1AC29P96LA91296,

3.  $8,692.42 IN FUNDS SEIZED FROM
    COMMERCE BANK ACCOUNT HELD
    IN THE NAME OF PSA, LLC.,

4.  $6,314.76 IN FUNDS SEIZED FROM
    COMMERCE BANK ACCOUNT HELD
    IN THE NAME OF PHARMACY USA,
    LLC, AND

5.  $1,076,636.89 IN FUNDS SEIZED
    FROM TD AMERITRADE ACCOUNT
    HELD IN NAME OF CHRISTOPHER
    NAPOLI,

              Defendants.

In this in rem forfeiture action, the United States alleges:

## JURISDICTION

1.      This Court has jurisdiction under Title 28, United States Code, Sections 1345 and 1355, Title 21 United States Code, Section 881 and Title 18, United States Code Section 981.

## PARTIES

2.      Plaintiff is the United States of America.

3.      The in rem Defendants (hereinafter collectively referred to as "defendant property") are further identified as follows:

        a.      1997 Lamborghini Diablo, VIN ZA9RU37P6VLA12636, Pennsylvania

                Licence # GLP4255, registered owner Christopher Napoli;

        b.      2006 Porsche Cayenne Turbo, VIN WP1AC29P96LA91296, Pennsylvania

                License # GHM-2734, registered owner Christine Napoli;

        c.      $8,692.42 in funds seized from Commerce Bank Account # xxxxx1285

                (NAPOLI ACCOUNT NO. 1) held in the name of PSA, LLC., a business

                owned and controlled by Christopher Napoli;

        d.      $6,314.76 in funds seized from Commerce Bank Account # xxxx8509

                (NAPOLI ACCOUNT NO. 2) held in the name of Pharmacy USA, LLC.,

                a business owned and controlled by Christopher Napoli; and

        e.      $1,076,636.89 in Funds Seized from TD Ameritrade Account #

                xxxxx8871 (NAPOLI AMERITRADE ACCOUNT) held in name of

                Christopher Napoli.

4.      The defendant property constitutes, and is traceable to, proceeds from the

**COMPLAINT FOR FORFEITURE**

unlawful distribution of controlled substances in violation of Title 21, United States Code, Section; it is thus subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(6). In addition, the defendant property constitutes property involved in, or traceable to, money laundering transactions, in violation of Title 18, United States Code, Sections 1956 and 1957, and thus subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

5.     The defendant property was seized pursuant to duly authorized seizure warrants issued by United States Magistrate Judge Edward Chen in January 2007. The defendant vehicles were seized in the Eastern District of Pennsylvania on or about June 11, 2007. These vehicles are currently in the custody of the United States Marshals Service in that district. The defendant funds from the Commerce Bank accounts were seized on or about January 11, 2007, in New Jersey. These funds are currently in the custody of the USMS in the District of New Jersey. The defendant funds from the Ameritrade Account were in San Francisco on or about January 23, 2007. These funds are currently in the custody of the USMS in this district.

## VENUE

6.     Venue lies in the Northern District of California, pursuant to Title 28, United States Code, Sections1355(b) and 1395(a), as some of the acts giving rise to this in rem action occurred in this district. In addition, since some of the property was found in this district and/or may be brought to this district, venue is proper here, pursuant to Title 28, United States Code, Sections 1395(b) and (c).

## INTRADISTRICT ASSIGNMENT

7.     This matter stems from the unlawful sale and distribution of controlled substances via the internet to consumers throughout the United States, including consumers residing in south

COMPLAINT FOR FORFEITURE

*3*

bay counties within the Northern District of California. This matter thus arises in the county of Santa Clara because a substantial part of the events which give rise to plaintiff's claims occurred in that county. In addition, the allegations set forth below are based, in large part, on the investigation related to criminal action captioned *United States v. Andrew Russo, et al*, CR 06-00748 RMW, currently pending in San Jose. Accordingly, pursuant to Civil Local Rule 3-12 and Criminal Local Rule 8-1, this matter should be assigned to the Honorable Ronald M. Whyte, United States District Judge, in San Jose.

## CONTROLLED SUBSTANCES ACT

8. The United States Drug Enforcement Administration ("DEA") is the federal agency charged with the responsibility of enforcing the controlled substances laws and regulations of the United States.

9. DEA is also responsible for, among other things, regulating the pharmaceutical industry, medical professionals, researchers, manufacturers, and distributors in complying with the Controlled Substances Act ("CSA"), codified at 21 U.S.C. § 801 et seq. The CSA governs the manufacture, distribution, and dispensing of controlled substances in the United States.

10. Pharmacies dispensing controlled substances are required to register with the DEA. A separate registration is required for each principal place of business where controlled substances were distributed or dispensed. A DEA registered pharmacy can engage in activities only as authorized by the state where the pharmacy was located.

11. The CSA is the federal law that places all controlled substances into one of five categories, or schedules, according to the drug's potential for abuse, physical and psychological dependence liability, and current accepted medical use. Various prescription drugs are scheduled substances under the CSA. There are five schedules of controlled substances

**COMPLAINT FOR FORFEITURE**

*4*

schedules I, II, III, IV, and V. Abuse of Schedule III drugs may lead to moderate or low physical dependence or high psychological dependence. Abuse of Schedule IV drugs may lead to more limited physical dependence or psychological dependence relative to the drugs or other substances in Schedule III.

12.    Title 21, Code of Federal Regulations, Section 1306.04(a) provides: A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

13.    Phentermine, a stimulant, is classified under federal narcotics laws as a Schedule IV controlled substance.

## STATE LAWS AND MEDICAL ASSOCIATION POSITIONS

14.    Many states have imposed requirements upon doctors and healthcare professionals to take certain steps before they could prescribe, distribute, or dispense controlled substances, including California, North Carolina, and Florida :

### CALIFORNIA LAW

Business and Professions Code

Section 4110. (a) No person shall conduct a pharmacy in the State of California unless he

COMPLAINT FOR FORFEITURE

or she has obtained a license from the board. A license shall be required for each pharmacy owned or operated by a specific person. A separate license shall be required for each of the premises of any person operating a pharmacy in more than one location. The license shall be renewed annually. The board may, by regulation, determine the circumstances under which a license may be transferred.

Section 4120. (a) A nonresident pharmacy shall not sell or distribute dangerous drugs or dangerous devices in this state through any person or media other than a wholesaler who has obtained a license pursuant to this chapter or through a selling or distribution outlet that is licensed as a wholesaler pursuant to this chapter without registering as a nonresident pharmacy.

Section 4067. (a) No person or entity shall dispense or furnish, or cause to be dispensed or furnished, dangerous drugs or dangerous devices, as defined in Section 4022, on the Internet for delivery to any person in this state without a prescription issued pursuant to a good faith prior examination of a human or animal for whom the prescription is meant if the person or entity either knew or reasonably should have known that the prescription was not issued pursuant to a good faith prior examination of a human or animal, or if the person or entity did not act in accordance with Section 1761 of Title 16 of the California Code of Regulations.

Health and Safety Code

Section 11153. (a) A prescription for a controlled substance shall only be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. Except as authorized by this division, the following are not legal prescriptions: (1) an order purporting to be a prescription which is issued not in the usual course of professional treatment or in legitimate and authorized research; or (2) an order for an addict or habitual user of controlled substances, which is issued not in the course of professional treatment or as part of an authorized narcotic treatment program, for the purpose of providing the user with controlled substances, sufficient to keep him or her comfortable by maintaining customary use.

## NORTH CAROLINA LAW

21 NCAC 46.1801 Right to Refuse a Prescription

(b) A pharmacist shall not fill or refill a prescription order if the pharmacist actually knows or reasonably should know that the order was issued without a physical examination of the patient and in the absence of a prior prescriber-patient relationship,

COMPLAINT FOR FORFEITURE

unless:
> (1) the prescription order was issued for the patient by a psychiatrist;
> (2) the prescription order was issued for the patient after discussion of the patient status with a treating psychologist, therapist, or physician;
> (3) the prescription order was ordered by a physician for flu vaccinations for groups of patients or members of the public;
> (4) the prescription order was for prophylactic purposes, such as the ordering of antibiotics by a pediatrician for members of a child's family when the child has a positive strep test;
> (5) the prescription order was an emergency order for medication related to pregnancy prevention; and
> (6) the prescription order was an order for medications to be taken by groups traveling to foreign countries.

21 NCAC 46. 1 805 Dispensing Drugs without a Prescription

> The dispensing of or any delivery of a prescription drug, including the surrender of control or possession in any manner which results in a delivery of a prescription drug, without a valid prescription order is unlawful. Refilling a prescription for a prescription drug without authorization is unlawful.

21 NCAC 46.18 11 Excessive Dispensing of Prescription Drugs

> Pharmacists shall not dispense and permit holders shall not allow a pharmacist to dispense prescription drugs at such a rate per hour or per day as to pose a danger to the public health or safety.

## FLORIDA LAW

### 465.0197 Internet pharmacy permits.--

(1) Any person desiring a permit to operate an Internet pharmacy shall apply to the department for an Internet pharmacy permit. If the board certifies that the application complies with the applicable laws and rules of the board governing the practice of the profession of pharmacy, the department shall issue the permit. No permit shall be issued unless a licensed pharmacist is designated as the prescription department manager for dispensing medicinal drugs to persons in this state. The licensed pharmacist shall be responsible for maintaining all drug records and for providing for the security of the area in the facility in which the compounding, storing, and dispensing of medicinal drugs to persons in this state occurs. The permittee shall notify the department within 30 days of any change of the licensed pharmacist responsible for such duties. Every permittee that employs or otherwise utilizes pharmacy technicians shall have a written policy and procedures manual specifying those duties, tasks, and functions which a

COMPLAINT FOR FORFEITURE

pharmacy technician is allowed to perform.

(2) An Internet pharmacy must obtain a permit under this section to sell medicinal drugs to persons in this state.

(3) An Internet pharmacy shall provide pharmacy services at a high level of protection and competence and shall disclose to the board the following specific information:

(a) That it maintains at all times a valid, unexpired license, permit, or registration to operate the pharmacy in compliance with the laws of the state in which the dispensing facility is located and from which the medicinal drugs shall be dispensed.

(b) The location, names, and titles of all principal corporate officers and the pharmacist who serves as the prescription department manager for dispensing medicinal drugs to persons in this state. This disclosure shall be made within 30 days after any change of location, principal corporate officer, or pharmacist serving as the prescription department manager for dispensing medicinal drugs to persons in this state.

**465.022 Pharmacies; general requirements; fees.--**

(5) The Board of Pharmacy shall have the authority to determine whether a bona fide transfer of ownership is present and that the sale of a pharmacy is not being accomplished for the purpose of avoiding an administrative prosecution.

(6) Upon the completion of the investigation of an application, the board shall approve or disapprove the application. If approved, the permit shall be issued by the department.

(7) Permits issued by the department are not transferable.

**465.023 Pharmacy permittee; disciplinary action.--**

(1) The department or the board may revoke or suspend the permit of any pharmacy permittee, and may fine, place on probation, or otherwise discipline any pharmacy permittee who has:

(a) Obtained a permit by misrepresentation or fraud or through an error of the department or the board;

(b) Attempted to procure, or has procured, a permit for any other person by making, or causing to be made, any false representation;

(c) Violated any of the requirements of this chapter or any of the rules of the Board of Pharmacy; of chapter 499, known as the "Florida Drug and Cosmetic Act"; of 21 U.S.C. ss. 301-392, known as the "Federal Food, Drug, and Cosmetic Act"; of 21 U.S.C. ss. 821 et seq., known as the Comprehensive Drug Abuse Prevention and Control Act; or of chapter 893;

(d) Been convicted or found guilty, regardless of adjudication, of a felony or any other crime involving moral turpitude in any of the courts of this state, of any

**COMPLAINT FOR FORFEITURE**

other state, or of the United States; or

(e) Dispensed any medicinal drug based upon a communication that purports to be a prescription as defined by s. 465.003(14) or s. 893.02(20) when the pharmacist knows or has reason to believe that the purported prescription is not based upon a valid practitioner-patient relationship that includes a documented patient evaluation, including history and a physical examination adequate to establish the diagnosis for which any drug is prescribed and any other requirement established by board rule under chapter 458, chapter 459, chapter 461, chapter 463, chapter 464, or chapter 466.

**465.035 Dispensing of medicinal drugs pursuant to facsimile of prescription.--**

(1) Notwithstanding any other provision of this chapter, it is lawful for a pharmacy to dispense medicinal drugs, including controlled substances authorized under subsection (2), based on reception of an electronic facsimile of the original prescription if all of the following conditions are met:

(a) In the course of the transaction the pharmacy complies with laws and administrative rules relating to pharmacies and pharmacists.

(b) Except in the case of the transmission of a prescription by a person authorized by law to prescribe medicinal drugs:

1. The facsimile system making the transmission provides the pharmacy receiving the transmission with audio communication via telephonic, electronic, or similar means with the person presenting the prescription.

2. At the time of the delivery of the medicinal drugs, the pharmacy has in its possession the original prescription for the medicinal drug involved.

## MEDICAL ASSOCIATIONS

15. The American Medical Association ('AMA") is the largest association of medical doctors in the United States. Its purpose is to advance the interests of physicians, to promote better public health, to lobby for medical legislation, and to raise money for medical education. Since at least 1999, the AMA publicly announced its position that a physician who offers a prescription to a patient solely on the basis of an online questionnaire without ever having examined the patient has generally not met the appropriate medical standards of care.

16. The Federation of State Medical Boards of the United States, Inc. ("FSMB") is a

**COMPLAINT FOR FORFEITURE**

national organization comprised of the 70 medical boards of the United States, the District of Columbia, Puerto Rico, Guam and the U.S. Virgin Islands. On behalf of its membership, FSMB's mission is to improve the quality, safety, and integrity of health care through the development and promotion of high standards for physician licensure and practice. Since at least 2000, the FSMB has recognized that Internet web sites permitting customers to obtain prescription drugs without an adequate evaluation by a physician poses an immediate threat to public health and safety. As a result, FSMB has publicly announced its position that the prescribing of medications by physicians based solely on an online questionnaire fails to meet an acceptable standard of care and is outside the bounds of professional conduct.

## INTERNET PHARMACIES

17. This case involves the unlawful distribution of controlled substances through internet pharmacies. These internet pharmacies generally operated as described below.

18. Individuals that operated web sites to sell pharmaceuticals generally created an Online Pharmacy Affiliate Program ("OPAP") or joined an existing OPAP to manage their e-commerce business. OPAPs were simply contractual agreements establishing an e-commerce business to oversee the acquisition, sale and distribution of pharmaceuticals and other related products. OPAPs generally consisted of five (5) or fewer interested parties involved in an online transaction: (1) the customer; (2) an Affiliate site; (3) a Merchant site; (4) a Physician Network and; (5) a Pharmacy Network. OPAP maintained merchant web sites ("Merchants") to facilitate the sale of their products. OPAPs established accounting systems to receive and make payments; opened bank accounts to hold operating capital; recruited affiliate web sites ("Affiliates"), physicians and pharmacies; contracted for services provided by credit card and overnight shipping companies; purchased and/or developed and maintained sophisticated software to track

COMPLAINT FOR FORFEITURE

all aspects of their business; and, provided Affiliates, Physician Networks and Pharmacy Networks with e-business assistance and instruction.

19.    Affiliate web sites were the web sites the customer first saw when attempting to purchase the OPAP's products. The customers do not purchase the pharmaceuticals from the Affiliate web sites, but were usually electronically re-directed to the Merchant site where the purchase occurred.

20.    Merchant web sites were the online stores from which customers ultimately purchased pharmaceuticals. These sites took the customer's order, collected the money via credit card or other electronic means, directed OPAP physicians to approve drug orders, fulfilled the orders through a Pharmacy Network and shipped the products to the customer.  When a customer enters a Merchant web site and clicked to purchase an item, the Merchant web site prompted the customer to provide his/her biographical information, shipping information, payment method and a medical history in the form of an online questionnaire. The data provided by the customer was stored in a database that was accessible through a web-based interface by OPAP physicians who viewed and approved, and pharmacies that filled and shipped, pending orders.

21.    A Physician Network used by the OPAP consisted of one or more doctors who were recruited and contracted by the OPAP to approve drug orders for customers ordering from the Merchant site. After the customer submitted a request to purchase pharmaceuticals, the Merchant site electronically stored the order details until the order was accessed by a network physician. The physician accessed the Merchant site's "back end" by providing his or her user identification and password. This "back end" consisted of a database and administrative tools that were not accessible to the general public. The physician subsequently reviewed the customer's request, clicked a box to approve the order and then clicked a button to submit the

COMPLAINT FOR FORFEITURE

now approved order to the Pharmacy Network for filling.

22.    An OPAP used one or more contracted pharmacies of a Pharmacy Network to fill a customer's drug order. Similar to the network physician, an employee of the network pharmacy accessed the Merchant "back end" site by providing a user name and password and then identified the orders that the pharmacy could fill and ship. Through web-based software, the Merchant site generated a label for the pill bottle containing pertinent information about the consumer, the pharmaceutical, the approving physician and the participating pharmacy. The software also generated the appropriate pharmaceutical advisory/contraindication sheet and a shipping label bearing the consumer's name and address. Once the participating pharmacy filled the prescription, they packaged it, attached the preprinted shipping label and shipped it to the customer via

a commercial courier service, most frequently Federal Express or United Parcel Service.

### FACTS

23.    Plaintiff incorporates by reference the allegations of paragraphs one through twenty-two as though fully set forth herein.

24.    At all times relevant herein, United Care Pharmacy (UCP) obtained a DEA retail pharmacy registration on June 6, 2005 for 2420 S. 17th Street, Unit C, Wilmington, North Carolina. UCP's DEA registration was surrendered on March 8, 2006 after the North Carolina Board of Pharmacy executed a Summary Suspension Order.

25.    At all times relevant herein, Andrew Russo was the president and sole director of United Care Pharmacy, Inc. and was the organizer of United Care Pharmacy, LLC.  United Care Pharmacy, Inc. was a Nevada corporation incorporated on or about May 26, 2005.  United Care Pharmacy, LLC. was a North Carolina Limited Liability Company organized on or about May

**COMPLAINT FOR FORFEITURE**

23, 2005. Andrew Russo was the Chief Operating Officer ("C.O.O.") of UCP. UCP distributed and dispensed controlled substances and other prescription drugs for OPAP/OPANs operated by other individuals and also distributed and dispensed controlled substances for an OPAP/OPAN controlled by the same individuals that operated UCP.

26.    At all times relevant herein, Dennis Leborgne was Russo's partner and the Chief Technology Officer ("C.T.O.") in the operations of UCP and the associated websites. From in or about March 2005 through at least January 2006, Leborgne was the C.T.O. for UCP. Leborgne's responsibilities included the recruitment of affiliates, securing online payment processing, establishing merchant accounts, and software integration.

27.    On or about November 15, 2006, a federal grand jury for the Northern District of California returned an indictment charging Andrew Russo and Denis Leborgne, among others, with drug trafficking and money laundering offenses for their participation in a conspiracy to distribute and dispense controlled substances via the internet through their operation of UCP, in violation of Title 21, United States Code, Section 846.

29.    It was the object of the conspiracy to sell, via the Internet, controlled substances to consumers in the United States and to distribute and dispense those controlled substances from UCP.

30.    In furtherance of the conspiracy, Russo, Leborgne and others caused the controlled substances to be distributed and dispensed to customers without: an adequate patient history; performing a mental or physical exam; using appropriate diagnostic or Laboratory testing; or providing a means to monitor medication response, in violation of the federal requirements under the CSA, regulations set forth in the Code of Federal Regulations, and various state laws requiring that controlled substances be dispensed only for a legitimate medical

**COMPLAINT FOR FORFEITURE**

purpose and in the usual course of professional medical practice.

31.    It was also part of the conspiracy that Russo, Leborgne and others, established a pharmacy and associated the pharmacy with an OPAP operated by other individuals to distribute pharmaceuticals as well as distributing pharmaceuticals for an OPAP operated by several members of the conspiracy to citizens of the United States, without requiring a face-to-face meeting or any consultation with a physician. The defendants obtained money from OPAP owners for distributing and dispensing drug orders obtained via the Internet. In addition, the defendants obtained money from customers through web sites that represented that a physician would review an online health questionnaire completed by the customer and issue a valid and lawful prescription that would be filled by a licensed pharmacy, when in truth and in fact, there was no meaningful physician review prior to approval, and no valid and lawful prescription was issued.

30.    Christopher Napoli is the owner and operator of the following  businesses PHARMACY USA, PSA, LLC and SSO, LLC (SAFE SCRIPTS ONLINE). These three entities were e-commerce businesses that utilized UCP and other pharmacies to fill Internet drug orders. During the course of this investigation, agents seized by Search Warrant e-mail communications which showed Napoli provided Andrew Russo, the owner of UCP, and Denis Leborgne, an employee of Russo's, access to a database and administrative software (also known as a "backend web site") that Russo and Leborgne used to fulfill drug orders received by Napoli's e-commerce businesses.

31.    In or about April 2006, investigators with the Philadelphia DEA office advised Napoli's attorney that Napoli was operating an illegal business by filling Internet drug orders to customers who did not first have a valid patient-practitioner relationship. Shortly thereafter,

COMPLAINT FOR FORFEITURE

Napoli filed a lawsuit against the Federal Government stating, in essence, that distributing drugs over the Internet by reviewing online medical questionnaires was legal. On November 13, 2006, the Honorable Judge Stewart Dalzell of the Eastern District of Pennsylvania dismissed the lawsuit filed by NAPOLI.

32.      In a separate investigation, investigators with the North Carolina Board of Pharmacy served an order summarily suspending both the permit of UCP and the license of its pharmacist – John Francis Tuite, R.Ph, a defendant in the criminal action currently pending in this district, on March 8, 2006. Russo and Tuite were interviewed as part of the proceeding.

33.      During his interview, Russo told investigators that approximately 90% of the pharmaceuticals dispensed by UCP were diet products (Schedule IV controlled substances). He also claimed that he did not possess or sell any Schedule III controlled substances. This statement, however, was in stark contrast to the records later obtained during the course of this investigation from wholesale pharmaceutical distributors, which showed that Russo ordered hydrocodone and phendimetrazine, both Schedule III controlled substances.

34.      Russo also admitted that he had no idea if there was any sort of patient-practitioner relationship when UCP filled an order. Furthermore, Russo acknowledged that he neither had communication with the physicians approving drug orders nor did he know if a customer completed an online medical questionnaire prior to the purchase or receipt of a controlled substance a violation of 21 C.F.R. § 1304.05.

35.      Russo also told investigators that UCP was a fill center where thousands of drug orders were received daily from multiple physicians who worked for various web sites.

36.      Russo admitted to DEA Diversion Investigators that in a December 14, 2005, pre-registration investigation to become a wholesale pharmaceutical distributor that he lied about

**COMPLAINT FOR FORFEITURE**

his knowledge or experience with the distribution of controlled substances (in the form of pharmaceuticals).

37.    At the conclusion of the March 8, 2006 interview, Russo voluntarily surrendered UCP's DEA registration which, in effect, revoked UCP's privilege to dispense controlled substances.

38.    Investigators also interviewed Tuite. Tuite, UCP's pharmacist, said that the pharmacy filled between 3,000 to 5,000 orders per day which filled for customers who placed their orders through e-commerce businesses. Tuite stated he was the only pharmacist employed by UCP and admitted that he did not check every order that was filled and sent to their customers, a violation of 21 C.F.R. § 1304.05.

39.    Tuite did not know any of the physician's names who approved the orders. He confirmed that there was no valid patient-practitioner relationship, a violation of 21 C.F.R. § 1306.04, and admitted that he did not verify the prescription by calling the physician as required by 21 C.F.R. § 1306.05 and 21 C.F.R. § 1306.21.

40.    Tuite stated that he did not know how a customer placed an order, that he did not know how a doctor authorizes a drug order and that he did not know if a customer was examined prior the order being approved.

41.    Due to the large volume of orders, Tuite could not advise investigators whether any customer had placed and received multiple orders in a short period of time. He added that he believed a customer could receive the same order from multiple doctors within the week, and that he would never catch this type of activity because of the volume processed through UCP.

42.    Tuite related that to the best of his knowledge, no offer of patient counseling was made to any of the patients at any point during the dispensing or shipping process.

COMPLAINT FOR FORFEITURE

43.    During this proceeding, a ledger documenting the drugs distributed from UCP was seized. Agents reviewed this drug ledger which showed that for the period of September 16, 2005 through February 13, 2006, UCP filled at least 16,705 orders for the Napoli's e-commerce businesses PHARMACY USA, PSA, LLC and SAFE SCRIPTS ONLINE (SSO, LLC).

44.    These distributions were correlated to payments made by Napoli and received into bank accounts held for the benefit of UCP . These payments were reimbursement for product costs and commission payments for orders filled by UCP.

45.    Using fictitious medical and identifying information, agents placed an order for controlled substances through Napoli' web site SAFESCRIPTIONSONLINE.COM. In violation of 21 C.F.R. § 1306.04(a), no physician or pharmacist contacted the agents to confirm the need for the drugs.

46.    As a result of the Summary Suspension of UCP's registration, investigators of the North Carolina Board of Pharmacy interviewed Brandon Winstead an employee of both UCP and Kwic Fill, Inc. Winstead said he was aware that both UCP and Kwic Fill, Inc. had been closed by the North Carolina Board of Pharmacy and the DEA for filling Internet drug orders in violation of 21 C.F.R. § 1306.04(a).

47.    After Kwic Fill, Inc was closed, Winstead relocated to Florida where he operated Discount US Drugs, also known as, Discount Pharmacy, (hereafter Discount US Drugs) for Napoli.

48.    Records obtained for Napoli's bank accounts revealed several large dollar wire transfers to CFP, LLC. According to the Florida Department of State, Division of Corporations, CFP, LLC was listed to Winstead.

49.    A DEA Administrative Inspection Warrant was executed at Discount US Drugs

COMPLAINT FOR FORFEITURE

*17*

and Winstead was identified as the Director of Operations. During the execution of the warrant, DEA investigators reviewed documents that revealed Discount US Drugs had filled Internet drug orders based on an online questionnaire, in violation of 21 C.F.R. § 1306.04(a). Specifically, the investigators identified at least four (4) drug orders approved on the same date for four (4) individuals residing in different states whose orders had been approved by Dr. Joseph Carozza, a DEA registered physician in Merrick, New York.

50.     Investigators of the New York DEA office interviewed Dr. Carozza who admitted to approving Internet drug orders in violation of 21 C.F.R. § 1306.04(a).

51.     The manager of e-commerce business Affpower/Grbglobal was interviewed. The manager stated that between March 8 and April 31, 2006, Napoli processed approximately 25,162 orders for controlled substances through Napoli's e-commerce business, PHARMACY USA, to benefit Affpower/Grbglobal. The manager stated that most of these were orders for the Schedule IV controlled substance phentermine and that Napoli was paid more than $1 million to act as a middle man for this service. The manager later learned that those drug orders were filled by Jeffrey Herholz's pharmacy, Kwic Fill, Inc.

52.     The manager said the relationship between Napoli's PHARMACY USA and Affpower/Grbglobal resulted from the revocation of UCP's DEA and North Carolina pharmacy licenses. These revocations resulted in a shortage of pharmacies available to fill online drug orders.

53.     From a review of Napoli's bank account records agents determined that two credit card processors (Rx- Payments, Ltd and Optimal Payments) primarily funded NAPOLI'S ACCOUNT NOS. 1 and 2. In addition, agents observed disbursements from NAPOLI ACCOUNT NO. 1 to individuals and entities involved in the scheme. These individuals and

**COMPLAINT FOR FORFEITURE**

entities and the evidence that show their involvement in the scheme are listed below:

**RX PAYMENTS LTD**

54.     The manager of Affpower/Grbglobal manager advised agents that they utilized Rx-Payments, Ltd., as their credit card payment processor. The manager stated that the owner of Rx-Payments, Ltd., Nathan Jacobson, was aware that Affpower/GRB Global was illegally distributing controlled substances via the Internet.

55.     RX Payments, Ltd., is an Israeli-based credit card processing company which processes payments specifically for Internet pharmacies. As a third party credit card processor, it is standard practice to receive a fee for processing credit card orders; the bulk of the funds, though, are deposited into a merchant's bank account.

56.     On August 30, 2006, agents of the Pittsburgh DEA office conducted an undercover purchase of the Schedule IV Controlled Substance phentermine from the e-commerce business SAFESSCRIPTSONLINE.COM which is owned by Napoli. The package which was delivered to and then recovered from an undercover mailbox revealed that the order was shipped from a Pennsylvania pharmacy Mail Meds, Inc.; the approving physician identified on the prescription label was Dr. Joseph Carozza.

a.     The investigators who placed this order did not have a "face to face" examination by the approving physician, did not have a preexisting patient-practitioner relationship with the physician and were not contacted by the physician at any time prior to or after receiving the drugs, a violation of 21 C.F.R. 1306.04(a).

b.     The statement for the credit card used in this transaction revealed the following descriptor: pending - serv@rxpayments.c IL IL $178.99. This descriptor was determined to be used by RX Payments, Ltd.

COMPLAINT FOR FORFEITURE

*19*

57.    A tracing of deposits made via wire transfer into Napoli's bank accounts originating from Rx-Payments, Ltd., was done. This tracing revealed that between December 14, 2005 and August 31, 2006, 111 deposits totaling $8,874,830.23 US were received.

**OPTIMAL PAYMENTS**

58.    Like RX Payments, Ltd., Optimal Payments is a Canadian-based credit card processing company. Spreadsheets contained in three seized e-mail communications sent in November 2005, from Optimal Payments to an Affpower/GRB Global employee's e-mail account documented credit card transactions processed by Optimal Payments for Affpower/GRB Global. A seized e-mail communication sent June 26, 2006, to this same Affpower/GRB Global employee from an accountant employed by Affpower/Grbglobal contained a spreadsheet reconciling orders processed by Optimal Payments. This spreadsheet revealed for the period May 2005 through June 2006, Optimal Payments processed at least $75,400,000.00 worth of orders for Affpower/Grbglobal.

59.    Analysis of NAPOLI's bank accounts revealed 31 deposits into Napoli Account No. 2, in cumulative excess of $1,450,000.00 were received via wire transfer from Optimal Payments. This analysis revealed that Napoli Account No. 2 was primarily funded by Optimal Payments.

**MARYMINA, INC**

60.    On September 6, 2006, a search warrant was executed by agents of the New York DEA office on Woodbury Pharmacy for the illegal distribution of controlled substances via the Internet; several seizure warrants were also executed by those agents on bank accounts held by the owner of Woodbury Pharmacy, including one under the name Marymina, Inc.

**COMPLAINT FOR FORFEITURE**

**CREATIVE PHARMACIES, INC**

61.    On February 20, 2006, the State of Iowa, Board of Pharmacy issued a complaint against the nonresident pharmacy license held by Creative Pharmacy Services, Inc., of Florida, doing business as Superior Drugs. The basis for this complaint was that Creative Pharmacies, Inc. filled orders for Schedule III and IV Controlled Substances that were placed by customers place the orders via the Internet and who did not have valid prescriptions in violation of Iowa State Law. Investigators from the Iowa Board of Pharmacy interviewed the owner of Creative Pharmacies, Inc., Wayne White. They asked White if he thought a valid physician-patient relationship existed for the Internet prescriptions his pharmacy filled. White replied, "Florida is a vacation state", and stated that it would not be unusual for a Pennsylvania physician to order a prescription for a patient in Iowa. The investigators asked White if he was concerned that individuals might be abusing the medications to whom his pharmacy distributed. White conceded that these patients were likely abusing or reselling the drugs, but he contended that the average "Walgreens" and hospital pharmacy were "doing the same thing" when they dispensed prescriptions to outpatients who are obtaining prescriptions inappropriately.

**AFFILIATED GROUP**

62.    According to the California Department of Corporations, the Affiliated Group is owned by Robyn Bloom. Through forum posts on a popular message board used by online pharmacy affiliate programs and their affiliates Bloom was identified as Napoli's affiliate manager. As an affiliate manager, Bloom would be in constant contact with affiliates to ensure each had been paid and each was happy with Napoli's online pharmacy affiliate program.

63.    One of the messages used to determine Bloom's status as Napoli's affiliate manager was posted on RxAffiliateForum.com under the user id "traveller"who posted a

COMPLAINT FOR FORFEITURE

message sent from "Robyn." This message advised the status of Napoli's lawsuit filed against the Government. The message addressed a credit card company decision to hold funds until all issues related to charge backs (product returns or claims by the customer that an item had not been ordered) had been resolved. The message furthered stated that until the funds were received from the credit card company, no payments would be made to the affiliates. The message ended "Best Regards, Everyone at SafeScriptsOnline."

64.    A seized e-mail communication, dated August 29, 2005, between two Affpower/Grbglobal managers, contained an attached spreadsheet which listed Affiliated Group, Inc as an affiliate of Affpower/Grbglobal. Information in this spreadsheet for an Affiliated Group, Inc., bank account noted Bloom was the contact person. This same account was used by Napoli to send payments to Bloom.

**DISCOUNT US DRUGS/TARKENOV TRADING/CHRISTOPHER LATHAM**

65.    According to information obtained during an execution of an Administrative Inspection Warrant at Discount US Drugs and the interviews of employees, Tarkenov Trading was identified as a company owned by Christopher Latham and received funds for fulfilling drug orders for Discount US Drugs. According to the Florida Department of State, Division of Corporations, Tarkenov Trading list Latham as the sole member listed for this company.

66.    On June 30, 2006, investigators from the DEA Orlando, Florida office executed an Administrative Inspection Warrant at Discount US Drugs, a pharmacy which was filling Internet orders based upon fraudulent prescriptions. The investigators interviewed the pharmacist, Norman Clement, who claimed that Discount US Drugs was a mail order pharmacy not one filling Internet drug orders. Investigators interviewed Brandon Winstead who said the owner of the pharmacy was Christopher Latham under the parent company Tarkenov Trading

**COMPLAINT FOR FORFEITURE**

L.L.C. Winstead refused to identify who paid his salary. He said he ordered the pharmaceutical stock for the pharmacy through such wholesale distributors as Martek, Stat and Cardinal Health. He noted he set up a computer system for Discount US Drugs.

67.    From a returned pill bottle, investigators retrieved a customer service telephone number (866) 873-3664. Neither Winstead or Clement admitted they knew where the calls to that number were received or who answered the phone. An open source database search for telephone number (866) 873-3664 revealed that this number appeared on Internet pharmacy web sites PillChamp.com and NewWayRx.com.

## ALPHA PHARMACY

68.    Alpha Pharmacy was a bricks-and-mortar pharmacy that filled orders for online pharmacy affiliate programs. On October 6, 2006, Martek Pharmacal, pursuant to 21 C.F.R. § 1301.74(b), filed an excessive purchase report with the DEA noting the purchase of 48,000 tablets of the Schedule IV Controlled Substance phentermine.

## MAIL MEDS, INC

69.    Mail Meds, Inc was a bricks-and-mortar pharmacy that filled orders for online pharmacy affiliate programs. On October 13, 2006, the DEA Pittsburgh, Pennsylvania office executed a federal search warrant at Mail Meds, Inc., for violations of Title 21, United States Code, Sections 841(a)(1) and 846. On that same day a bank account used by the owners of Mail Meds, Inc, Monmouth Medical Consultants, was seized pursuant to violation of Title 18, United States Code, Sections 1956 and 1957 that were predicated upon violations of Title 21, United States Code, Sections 841(a)(1) and 846.

70.    According to records received from United Parcel Service, Mail Meds, Inc shipping bills were paid by Monmouth Medical Consultants. In addition, Monmouth Medical

COMPLAINT FOR FORFEITURE

Consultants paid for the shipping for the following pharmacies: Alpha Pharmacy, Sain Solutions, LLC and Affinity, LLC.

71.     On August 30, 2006 and September 8, 2006, agents of the Pittsburgh DEA office conducted undercover purchases of the Schedule IV Controlled Substance phentermine from Napoli's Internet pharmacy, SAFESCRIPTSONLINE.COM. These orders were filled by Mail Meds, Inc., and approved by Dr. Joseph Carozza. For neither of these transactions did the investigators have a "face to face" examination by Dr. Carozza or a preexisting patient-practitioner relationship with Dr. Carozza or any communication with Dr. Carozza at any time prior to or after receiving the drugs.

**ACCOUNT ANALYSIS**

**NAPOLI ACCOUNT NO. 1**

72.     NAPOLI ACCOUNT NO. 1 was opened at Commerce Bank on December 14, 2005, with an initial deposit of $50.00. According to records maintained by Commerce Bank, the total deposits into NAPOLI ACCOUNT NO. 1 were in excess of $15.4 million from December 14, 2005 through August 31, 2006. This account received payments from credit card processing companies and online pharmacy affiliate programs (e-commerce businesses also known as Internet pharmacies) for processing drug orders. There were disbursements to Napoli's affiliates for orders routed to his business, payments made for other operating expenses, including the purchase of pharmaceuticals from a wholesale distributor and reimbursements to pharmacies for processing and shipping orders.

73.     The records documenting the period from December 14, 2005 through August 31, 2006, showed there were 286 deposits by wire transfer into NAPOLI ACCOUNT NO. 1. These

**COMPLAINT FOR FORFEITURE**

wire transfers originated from credit card processors, pharmacy owners, online pharmacy affiliate programs and NAPOLI ACCOUNT NO. 2.

74.    For each of the 286 deposits by wire transfer, the received funds were traced to businesses involved in the online and illegal distribution of controlled substances. These wire transfers are detailed below:

| Source | Amount | Number of Wires |
|---|---|---|
| RX PAYMENTS LTD | $8,874,830.23 | 111 |
| NAPOLI ACCOUNT NO. 2 | $1,259,412.00 | 10 |
| BANKCARD SETTLEMENT[1] | $841,163.45 | 33 |
| LAGRANT ENTERPRISES | $824,840.00 | 5 |
| GENETECHNICA | $597,751.73 | 16 |
| TINFORT SERVICES | $574,817.00 | 5 |
| ARDOPOLE INTERNATIONAL | $535,000.00 | 11 |
| DISCOVER NETWORK[2] | $523,379.90 | 85 |
| HEDA BUS CORP | $189,400.74 | 7 |
| MARYMINA INC | $183,500.00 | 1 |
| MERIDIAN MARKETING | $10,000.00 | 1 |
| DENIS LEBORGNE | $3,975.00 | 1 |
| | Total: $14,418,070.05 | 286 |

[1] A Bankcard Settlement is a term used in credit card processing when the credit card processor deposits funds into an merchants merchant bank account.

[2] The Discover Network processes Discover credit card orders.

**COMPLAINT FOR FORFEITURE**

75.    A further analysis of the wire transfers revealed payments were made almost exclusively to participants the scheme to distribute controlled substances. The following shows a partial list of the disbursements made from NAPOLI ACCOUNT NO. 1:

| Payee | Amount | Number of Wires |
|---|---|---|
| KWIC FILL INC | $1,873,205.08 | 15 |
| CREATIVE PHARMACIES INC | $1,065,635.39 | 34 |
| JEFF ENTEL | $876,791.83 | 28 |
| JOE CAROZZA | $273,566.90 | 34 |
| AFFILIATED GROUP | $147,603.96 | 32 |
| BRANDON WINSTEAD | $19,380.00 | 5 |
| CFP, LLC | $100,839.89 | 25 |
| TARKENOV TRADING | $116,642.29 | 19 |
| CHRISTOPHER LATHAM | $29,293.00 | 6 |
| DISCOUNT PHARMACY | $175,126.42 | 15 |
| TERRACE PHARMACY | $183,307.79 | 33 |
| UNITED CARE PHARMACY | $227,655.54 | 11 |
| WEXFORD CAPITAL | $370,079.59 | 27 |
| NAPOLI ACCOUNT NO. 3 | $530,000.00 | 5 |
| CYNTHIA LAMORTE | $33,927.00 | 6 |
| ALPHA PHARMACY | $82,948.40 | 5 |
| INTERNET COMMERCE CORP | $295,603.98 | 63 |
| LORRAINE CORCORAN | $324,835.76 | 7 |
| MAIL MEDS INC | $295,263.43 | 9 |

COMPLAINT FOR FORFEITURE

| | | |
|---|---|---|
| MARYMINA, INC | $971,862.48 | 9 |
| MERIDIAN MARKETING | $55,097.00 | 4 |
| MARTEK[3] | $1,750.00 | 1 |
| | Total: $8,050,415.73 | 393 |

76.     The investigation revealed that the drug proceeds received into NAPOLI

ACCOUNT NO. 1 were being used to promote illegal business because the funds were

subsequently disbursed to pharmacies, physicians, physician recruiters, partners, affiliates, online

pharmacy affiliate programs and everyday business expenses.

77.     On January 11, 2007, law enforcement agents executed a duly authorized seizure

warrant on Commerce Bank for the contents of NAPOLI ACCOUNT NO. 1.  Defendant

$8,692.42 constitutes the funds seized from this account.

**NAPOLI ACCOUNT NO. 2**

78.     According to records maintained by Commerce Bank, the total deposits into

NAPOLI ACCOUNT NO. 2 were in excess of $1.4 million from February 5, 2006 through

August 28, 2006.  All but $4,985.00 of the deposits into NAPOLI ACCOUNT NO. 2 were made

via wire transfers from Optimal Payments, the Canadian-based credit card processing company.

A further analysis of the wire transfers revealed the following deposits:

| Source | Amount | Number of Wires |
|---|---|---|
| OPTIMAL PAYMENTS | $1,450,199.85 | 31 |
| GOLD MILLENNIUM INVESTMENTS | $4,985.00 | 1 |
| | Total: $1,455,184.80 | 32 |

---

[3] Martek is a wholesale distributor of pharmaceuticals.  It should be noted that NAPOLI paid Martek for pharmaceuticals and NAPOLI does not possess a DEA registration nor is he (NAPOLI) registered as a pharmacist in any state.

COMPLAINT FOR FORFEITURE

79.    Analysis of the withdrawals from NAPOLI ACCOUNT NO. 2 that were made by wire transfers revealed that $1,259,412.00 was deposited into NAPOLI ACCOUNT NO. 1; $47,000.00 was transferred into NAPOLI ACCOUNT NO. 3; and $88,229.21 was sent to an account held at Commerce Bank that Napoli has since closed.

80.    NAPOLI ACCOUNT NO. 2 served as a conduit to other accounts held by Napoli. As deposits were received they were almost immediately transferred into other bank accounts owned by Napoli.  These funds were then either used to promote Napoli's illegal enterprise or to enrich Napoli.

81.    On January 11, 2007, law enforcement agents executed a duly authorized seizure warrant on Commerce Bank for the contents of NAPOLI ACCOUNT NO. 2.  Defendant $6,314.76 constitutes the funds seized from this account.

**NAPOLI ACCOUNT NO. 4  (aka Pershing, LLC account 35T-014469)**

82.    According to records maintained by Pershing, LLC, a stock brokerage firm located in Jersey City, New Jersey, from October 11, 2005 through April 7, 2006, deposits into NAPOLI ACCOUNT NO. 4 totaled $1,000,000.00.  Analysis of these deposits are detailed below:

| Source | Deposit | Withdrawal/Returns |
|---|---|---|
| Citizens Account #6212541276 | $500,000.00 | |
| (hereinafter referred to as CB#4) | | |
| Citizens Account CB#4 | $100,000.00 | |
| Citizens Account CB#4 | | $500,000.00 |
| Citizens Account #6104143729 | $150,000.00 | |
| (hereinafter referred to as CB#5) | | |

Commerce Cashiers Check #89-06258          $250,000.00

Commerce Cashiers Check #89-06329          $500,000.00 _____

Total:      $1,500,000.00      $500,000.00

83.    The source of the funds for each deposit made to Pershing, LLC was traced to accounts which were funded through Napoli's drug enterprise. Prior to opening NAPOLI ACCOUNT NOS. 1, 2 and 3, Napoli maintained three (3) Citizens Bank accounts under the names PSA, LLC, and PHARMACY USA, LLC which are now closed. These accounts are hereinafter referred to as CB#1, CB#2 and CB#3.

      a.    An analysis of records obtained from Authorize.Net, a credit card processor, and those of Citizens Bank accounts CB#2 and CB#3, revealed these accounts were primarily funded through credit card transactions associated with NAPOLI'S web site PharmacyUSAmeds.com.

      b.    According to a report obtained from the Oklahoma Bureau of Narcotics, in February 2006, an individual located in Oklahoma overdosed on Xanax. This Schedule IV Controlled Substance was ordered through NAPOLI'S web site PharmacyUSAmeds.com, approved by Dr. Joseph Carozza and shipped from United Care Pharmacy to the individual. There was no valid patient-practitioner relationship, a violation of 21 C.F.R. 1306.04(a).

84.    An analysis of Citizens Bank account CB#2 records for the period September 29, 2005 through March 8, 2006, showed more than $1.83 million was deposited into the account. Of that amount, more than $1.1 million originated from credit card transaction payments for Internet pharmacies, $63,858.74 was transferred from Citizens Bank account CB#5 and $672,500.00 was

**COMPLAINT FOR FORFEITURE**

received from account CB#1. The disbursements from Citizens Bank account CB#2 revealed that $322,100.00 was transferred to account CB#5, $16,620.15 was transferred to account CB#1; $332,372.46 was transferred to account CB#3.

85.     An analysis of Citizens Bank account CB#1 records for the period November 29, 2005 through February 8, 2006, revealed that more than $1 million originated from payment gateways processing credit card payments for Internet pharmacies, $24,682.14 was received from Citizens Bank account CB#3 and $16,620.15 was sent from Citizens Bank account CB#2. The records of disbursements from Citizens Bank account CB#1 revealed that $414,000.00 was transferred to Citizens Bank account CB#5, $2,453.22 was transferred to Citizens Bank account CB#3 and $672,500.00 was transferred to Citizens Bank account CB#2.

86.     An analysis of Citizens Bank account CB#5 showed the account was primarily used to fund Citizens Bank account CB#4 ($400,000.00) and that Citizens Bank account CB#4 in turn, was used to fund two wire transfers into NAPOLI ACCOUNT NO. 4. The first transaction in the amount of $500,000.00 was eventually returned on November 1, 2005 and the other deposit in the amount of $100,00.00 was successfully deposited into NAPOLI ACCOUNT NO. 4.

87.     An analysis of the Citizens Bank account CB#5 revealed funds in the amount $150,000.00 were transferred into NAPOLI ACCOUNT NO. 4. Further, Citizens Bank account CB#5 was primarily funded by deposits received from Napoli's Citizen Bank accounts CB#1 and CB#2 - a total of $736,100.00 was received from those accounts.

88.     Records for another Commerce Bank account held by Napoli, but which is now closed, were analyzed. The records show that $850,000.00 was deposited into the account; the source of these funds was NAPOLI ACCOUNT NO. 1.

**COMPLAINT FOR FORFEITURE**

a.    After these funds were transferred, a Cashier's Check in the amount $250,000 was purchased which drew upon the funds now held in the closed Commerce Bank account. This Cashier's Check was later deposited into NAPOLI ACCOUNT NO. 4.

b.    Subsequently on March 31, 2006, Napoli transferred $500,000.00 from NAPOLI ACCOUNT NO. 1 into the closed Commerce Bank account. On that same day, Napoli purchased a cashiers check in the amount of $500,000.00 and deposited it into NAPOLI ACCOUNT NO. 4.

**NAPOLI AMERITRADE ACCOUNT**

89.    The tracing of funds received into NAPOLI ACCOUNT NO. 4 revealed the source of the income to be illegal distributions of controlled substances.   As a result, and as noted in paragraph 1, a Seizure Warrant was issued on January 3, 2007, by Magistrate Judge Edward Chen for the funds in this account. On January 11, 2007, when it was learned that the funds in NAPOLI ACCOUNT NO. 4 had been transferred to the TD Ameritrade account number 785678871 (NAPOLI AMERITRADE ACCOUNT) an application for a new Seizure Warrant was submitted. On January 11, 2007, Judge Chen approved the Seizure Warrant and authorized the seizure of the funds in the NAPOLI AMERITRADE ACCOUNT.

**PURCHASE OF DEFENDANT LAMBORGHINI**

90.    According to records obtained from Commerce Bank, Lorraine A. Corcoran sent a payment in the amount of $169,000.00 to The Sports Car Company, Inc. on June 4, 2006 from an account controlled by Napoli, which is now closed. An Internet keyword search on "The Sports Car Company, Inc." revealed an eBay listing for the sale of exotic cars. An Internet keyword search on "Nunobee", a moniker utilized by NAPOLI, revealed that Napoli won the bid for a

**COMPLAINT FOR FORFEITURE**

1997 Lamborghini Diablo from the eBay Id "sportscarcompany" for the amount of $169,000.00. According to records obtained from PayPal, eBay Id "Nunobee" has been listed to Napoli since June 3, 2006. A subsequent interview with the owner of the Sports Car Company, Inc confirmed that Napoli purchased the defendant Lamborghini.

91.     An analysis of Napoli's (closed) Commerce Bank account revealed a disbursement in the amount of $169,000.00 to The Sports Car Company, Inc. This account was primarily funded by transfers from NAPOLI ACCOUNT NOS. 1 and 2. Prior to the purchase of NAPOLI PROPERTY NO. 1, NAPOLI transferred more than $1.5 million account number into the Commerce Bank account from the NAPOLI ACCOUNT NOS. 1 and 2.

92.     On January 11, 2007, law enforcement agents executed a duly authorized seizure warrant for the defendant Lamoborghini in Pennsylvania. The defendant Lamborghini constitutes property traceable to proceeds from the unlawful distribution of controlled substances, and property which was the subject of a money laundering transaction.

**PURCHASE OF DEFENDANT PORSCHE CAYENNE TURBO**

93.     According to records obtained from the Pennsylvania Department of Transportation, the defendant Porsche is registered to Christine M. Napoli at 1825 Lawrence Road, Havertown, Pennsylvania. In addition, analysis of Napoli's Commerce Bank account number 0366774503 revealed a disbursement to Brandywine Porsche in the amount of $97,039.46. According to Brandywine Porsche, the defendant Porsche was sold to Christine Napoli, Napoli's wife. Analysis of Napoli's Commerce Bank account number 0366774503 revealed that this account was primarily funded by NAPOLI ACCOUNT NOS. 1 and 2. In addition, prior to the purchase of the defendant Porsche, Napoli transferred $400,000.00 into his Commerce Bank account number 0366774503.

**COMPLAINT FOR FORFEITURE**

94.     On January 11, 2007, law enforcement agents executed a duly authorized seizure warrant for the defendant Porsche in Pennsylvania.  The defendant Porsche constitutes property traceable to proceeds from the unlawful distribution of controlled substances, and property which was the subject of a money laundering transaction

## FIRST CLAIM FOR RELIEF

### 21 U.S.C. § 881(a)(6)

### (forfeiture of drug proceeds)

95.     Plaintiff incorporates by reference the allegations of paragraphs one through 94 as though fully set forth.

96.     Title 21, United States Code, Section 881(a)(6) provides, in part, for the forfeiture of all monies or other things of value furnished or intended to be furnished to be furnished by any person in exchange for a controlled substance, all proceeds traceable to such an exchange, and all monies used or intended to be used to facilitate the distribution and possession with the intent to distribute a controlled substance., including violations of Title 21, United States Code, Sections 841, 843(b) and 846.

97.     In light of the foregoing, and considering the totality of the circumstances, there is probable cause to believe that the defendant property represents moneys furnished or intended to be furnished to another person in exchange for a controlled substance, constitutes proceeds derived from such an exchange, and was used or intended to be used to facilitate an offense, in violation of Title 21, United States Code, Sections 841(a) and 846, and thus subject to forfeiture under Title 21, United States Code, Section 881(a)(6).

/ /

**COMPLAINT FOR FORFEITURE**

1

**SECOND CLAIM FOR RELIEF**

2

**18 U.S.C. § 981(a)(1)(A)**

3

**(forfeiture of property involved in violation of 18 U.S.C. § 1956(h)- property involved in money**

4

5

**laundering conspiracy)**

6

98.     Plaintiff incorporates by reference the allegations of paragraphs one through 97 as

7

though fully set forth.

8

99.     Title 18, United States Code, Section 981(a)(1)(A) provides, in part, for the forfeiture

9

of any property, real or personal, involved in or traceable to a transaction or attempted transaction,

10

11

in violation of Title 18, United States Code, Sections 1956 and 1957.

12

100.     Title 18, United States Code, Section 1956(h) prohibits a person from conspiring to

13

commit any violation of Title 18, United States Code, Sections 1956 or 1957.

14

101.     In light of the foregoing and considering the totality of the circumstances, the

15

16

defendant property constitutes property involved in a violation of Title 18, United States Code,

17

Section 1956(h) and thus is subject to forfeiture to the United States pursuant to Title18, United

18

States Code, Section  981(a)(1)(A).

19

**THIRD CLAIM FOR RELIEF**

20

**18 U.S.C. § 981(a)(1)(A)**

21

**(forfeiture of property involved in violation of 18 U.S.C. § 1957- engaging in money transaction in**

22

**property derived from specified unlawful activity)**

23

102.     Plaintiff incorporates by reference the allegations of paragraphs one through 101 as

24

though fully set forth.

25

103.     Title 18, United States Code, Section 981(a)(1)(A) provides, in part, for the forfeiture

26

27

of any property, real or personal, involved in or traceable to a transaction or attempted transaction,

28

in violation of Title 18, United States Code, Sections 1956 and 1957.

**COMPLAINT FOR FORFEITURE**

104.    Title 18, United States Code, Section 1957 prohibits one from knowingly engaging or attempting to engage in monetary transactions in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

105.    Title 21, United States Code, Section 841(a)(1) prohibits, in part, the distribution and possession with the intent to distribute a controlled substance, including phentermine.  Sections 841(a) is a specified unlawful activities under Title 18, United States Code, Sections 1956(C)(7)(A) and 1961.

106.    Title 21, United States Code, Section, 846 prohibits a person from attempting or conspiring to distribute and possess with the intent to distribute a controlled substance.  Section 846 is a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961.

107.    In light of the foregoing and considering the totality of the circumstances, the defendant vehicles constitutes property involved in a violation of Title 18, United States Code, Section 1957 and thus is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section  981(a)(1)(A).

//

//

**COMPLAINT FOR FORFEITURE**

1

**PRAYER FOR RELIEF**

2

Plaintiff prays that due process issue to enforce the forfeiture of the defendant property, that

3

due notice be given to all interested parties to appear and show cause why the forfeiture should not

4

be decreed, that judgment of forfeiture be entered against the defendant proeprty, and that plaintiff

5

be awarded such other relief as may be proper and just.

6

7

8

9

Dated: June 13th, 2007                    Respectfully submitted,

10

11                                         SCOTT N. SCHOOLS
                                           United States Attorney
12

13

14

15                                         STEPHANIE HINDS
                                           Assistant United States Attorney
16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, KARL NICHOLS, states as follows:

1.      I am a Special Agent for Drug Enforcement Administration.  I am familiar with the facts in the investigation leading to the filing of this Complaint for Forfeiture.

2.      I have read the Complaint for Forfeiture and based upon review of relevant investigative reports, review of documentary evidence, discussions with other persons involved in the investigation and participation in the investigation, I believe that the allegations contained therein are true.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 13TH day of June 2007, in San Francisco, California.



_____
KARL NICHOLS

**COMPLAINT FOR FORFEITURE**